# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

## January 2015 Term

No. 14-0050

FILED

**May 13, 2015**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## IN RE: L.M. AND L.S.

---

Appeal from the Circuit Court of Calhoun County
Honorable Thomas C. Evans, III, Judge
Civil Action Nos. 13-JA-2E and 13-JA-3E

**AFFIRMED**

---

Submitted: February 25, 2015
Filed: May 13, 2015

Berkeley L. Simmons
Simmons & Simmons
Elizabeth, West Virginia
Attorney for the Petitioners,
B.S. and D.S.

Patrick Morrisey
Attorney General
Christopher S. Dodrill
Assistant Attorney General
Charleston, West Virginia
Katherine M. Bond
Assistant Attorney General
White Hall, West Virginia
Attorneys for the Respondent,
West Virginia Department of
Health and Human Resources

Loren B. Howley
Grantsville, West Virginia
Guardian *ad Litem* for the
Minor Children, L.M. and L.S.

**JUSTICE DAVIS delivered the Opinion of the Court.**

1.      "'This Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo.*' Syl. Pt. 4, *Burgess v. Porterfield,* 196 W. Va. 178, 469 S.E.2d 114 (1996)." Syllabus point 1, *Napoleon S. v. Walker*, 217 W. Va. 254, 617 S.E.2d 801 (2005).

2.      "In . . . custody matters, we have traditionally held paramount the best interests of the child." Syllabus point 5, in part, *Carter v. Carter*, 196 W. Va. 239, 470 S.E.2d 193 (1996).

3.      "'Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review.' Syllabus point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995)." Syllabus point 3, *Alden v. Harpers Ferry Police Civil Service Commission*, 209 W. Va. 83, 543 S.E.2d 364 (2001).

4.      "Although conclusions of law reached by a circuit court are subject to a *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts

without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syllabus point 1, *In the Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

5.   "The primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syllabus point 1, *Smith v. State Workmen's Compensation Commissioner*, 159 W. Va. 108, 219 S.E.2d 361 (1975).

6.   "Where the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation." Syllabus point 2, *State v. Elder*, 152 W. Va. 571, 165 S.E.2d 108 (1968).

7.   "It is the duty of a court to construe a statute according to its true intent, and give to it such construction as will uphold the law and further justice. It is as well the

duty of a court to disregard a construction, though apparently warranted by the literal sense of the words in a statute, when such construction would lead to injustice and absurdity." Syllabus point 2, *Click v. Click*, 98 W. Va. 419, 127 S.E. 194 (1925).

8.     "'It is well established that the word "shall," in the absence of language in the statute showing a contrary intent on the part of the Legislature, should be afforded a mandatory connotation.' Syllabus Point 1, *Nelson v. West Virginia Public Employees Insurance Board*, 171 W. Va. 445, 300 S.E.2d 86 (1982)." Syllabus point 1, *E.H. v. Matin*, 201 W. Va. 463, 498 S.E.2d 35 (1997).

9.     The mandatory language of W. Va. Code § 49-3-1(a)(3) (2001) (Repl. Vol. 2014) requires that a home study evaluation be conducted by the West Virginia Department of Health and Human Resources to determine if any interested grandparent would be a suitable adoptive parent.

10.     While the grandparent preference statute, at W. Va. Code § 49-3-1(a)(3) (2001) (Repl. Vol. 2014), places a mandatory duty on the West Virginia Department of Health and Human Resources to complete a home study before a child may be placed for adoption with an interested grandparent, "the department shall first consider the [grandparent's] suitability and willingness . . . to adopt the child." There is no statutory

requirement that a home study be completed in the event that the interested grandparent is found to be an unsuitable adoptive placement and that placement with such grandparent is not in the best interests of the child.

**Davis, Justice:**

In this case, the Court must determine whether grandparent placement is appropriate for two minor children: L.M.[1] and L.S. The maternal grandparents, B.S. and D.S., the petitioners herein and intervenors below (hereinafter "grandparents"), appeal the circuit court's December 19, 2013, order. By that order, the lower court denied the grandparents' request to intervene and their motion for placement of the minor children in their home. Both the respondent, the West Virginia Department of Health and Human Resources (hereinafter "DHHR"), as well as the Guardian *ad litem* (hereinafter "Guardian") for the minor children, assert that the grandparents' home is not a proper placement for the children. Based on the parties' briefs, the appendix record designated for our consideration, and the pertinent authorities, we find that the circuit court's ruling was proper; thus, it is affirmed.

**I.**

**FACTUAL AND PROCEDURAL HISTORY**

This case involves the proper placement for two children: L.M., a three-year-old boy, and his younger sister, L.S., who is two. The DHHR filed an abuse and neglect petition on January 11, 2013, prior to L.S.'s birth, alleging that L.M. was neglected by his

---

[1]"We follow our past practice in . . . cases which involve sensitive facts and do not utilize the . . . names of the parties." *State ex rel. W. Va. Dep't of Human Servs. v. Cheryl M.,* 177 W. Va. 688, 689 n.1, 356 S.E.2d 181, 182 n.1 (1987) (citations omitted).

1

parents as a result of chronic substance abuse. The petition maintained that L.M. had been exposed to drug paraphernalia and that police had seized a clandestine methamphetamine (hereinafter "meth") lab from the mother's home, a trailer that had been purchased for her by her parents, the grandparents herein. The DHHR sought and received custody of L.M., and placed him in foster care. Thereafter, on January 17, 2013, the grandparents filed a motion to intervene and, further, moved for placement of L.M. in their home. The DHHR opposed this motion; however, the circuit court granted physical custody of L.M. to the grandparents.

L.M.'s younger sister, L.S., was born soon thereafter in March 2013. At birth, L.S. tested positive for substantial amounts of alcohol and trace amounts of controlled substances, cotinine and hydrocodone, in her bloodstream. The DHHR amended its petition to include L.S., and was granted custody of L.S. When L.S. was released from the hospital, she also was placed in her grandparents' care. The following day, the DHHR's child protective service (hereinafter "CPS") worker conducted an unannounced home visit to the grandparents' home. While there, the CPS worker took photographs of the children's living environment.

Subsequent to the home inspection, the CPS worker was examining pictures taken of the grandparents' home and compared them with photographs that had been taken

2

of the mother's home on the day the meth lab had been discovered.  CPS determined that several baby items in the grandparents' home were the same items that had been in the mother's meth-contaminated home.  Specifically, CPS identified a bassinet and a baby swing.

Based upon its concern that the children currently were exposed to items in the grandparents' home that had been contaminated in an unremediated meth environment, the DHHR filed a motion for emergency custody and for the children to be removed from the grandparents' home.  The circuit court granted the DHHR's motion to change placement, and the matter was set for a full hearing.

The hearing on the emergency motion for change of placement occurred on April 15, 2013.  The DHHR presented evidence that a baby bassinet and indoor baby swing were found in the grandparents' home where the children were placed.  It was asserted by the DHHR, through its witnesses' testimony, that these items were the same items that had been contaminated in the mother's trailer where she was managing a clandestine meth lab while L.M. was in the home.  The testimony presented by the DHHR focused on a comparison of the colors of the items in question, the ribbons attached thereto, the accessory bag on the side, the bars on the base, and the product warning labels.  Further, the DHHR presented testimony that the contamination of the mother's trailer caused by the meth lab resulted in the property being closed, with entry on the premises precluded and removal of items disallowed.  It was

3

stated, through a witness at the hearing, that exposure to the trailer or any items that had been inside of the trailer, such as the baby bassinet and swing, created a risk to the public health and safety. It was explained to the circuit court that meth residue on household items can cause adverse health effects, including respiratory issues.

Both grandparents also testified at the hearing on the emergency motion for removal of the children. They testified that they had purchased the trailer for their daughter, the children's mother, and that the trailer was located on the grandparents' property. Further, the trial statements from the grandparents indicated that the baby equipment in their home was not the same as had been in the mother's home but, rather, had been received from friends or elsewhere.

The circuit court, based on the evidence submitted at the emergency hearing regarding placement of the children, found that certain items in the photographs taken at the contaminated trailer were the same currently being used by the grandparents in their home. The lower court found that "it appears the items have been transferred from the unremediated trailer which once contained a methamphetamine lab, to the grandparent's [sic] home for use by them with the infant child." The motion for an emergency change of placement for the children was granted, and the children were removed from the grandparents' care.

4

Subsequent thereto, the rights of the biological parents were terminated by the circuit court.[2]

On December 2, 2013, the circuit court held a hearing on the grandparents' previously-filed motion to intervene and for placement of the children in their home. The circuit court took judicial notice of the evidence from the April 15, 2013, emergency hearing. CPS testified that placement of the children with the grandparents was concerning based on the fact that the grandparents' own children had trouble in school, and three of them became involved in drugs. Despite the drug issues, the grandparents continued to support and engage with their adult children, including posting bond for the adult children's drug charges. Therefore, CPS voiced concerns that the grandparents would not prevent interaction between the children and the mother, or preclude exposure to others with criminal proclivities, including illicit drug use.

At the hearing, the grandmother testified, reiterating her previous statements that the bassinet and the swing in her home were not from her daughter's trailer. Additionally, the grandparents' counsel proffered to the circuit court that the grandfather's

---

[2]The children's biological parents' rights were terminated July 8, 2013. The mother appealed the termination of her rights to this Court, and such termination was affirmed November 26, 2013. L.M.'s and L.S.'s fathers' rights also were terminated July 8, 2013. Neither father appealed. No parental rights are at issue in the instant case.

testimony would be the same as he previously had testified. Further, counsel for the grandparents also submitted that another witness had observed the bassinet and swing through the trailer's window on the same day that he had observed similar items in the grandparents' home.

The resultant court order, entered December 19, 2013, denied the grandparents' motion to intervene and motion for placement of the children in their home. The circuit court found that, while the grandparents proffered testimony concerning the bassinet and swing, they "did not proffer any new evidence, such as dated photographs to corroborate the proffered testimony, or the testimony of the person from whom the grandparents claimed they obtained the baby bassinet[.]" The circuit court found that there was no new evidence upon which to reconsider its previous finding that the grandparents had knowingly exposed the children to meth-contaminated baby equipment. It also found that, in the past, the grandparents had supported their adult children, who have had issues with drugs and crime, and had failed to protect their grandchildren. The circuit court found that "[t]he presumption in favor of placement with the grandparents has been rebutted in this case, based on clear and convincing evidence that the grandparents have exposed the children to the risk of imminent harm and lack sufficient judgment to ensure the children's safety." The circuit court expressed that it "considered the best interests of the children, including their need for continuity of care and caretakers, and their opportunity for adoption in a stable home

environment." Thus, the circuit court denied the grandparents' motion to intervene and for placement of the minor children. The grandparents appealed to this Court.

Currently, both siblings are placed together with a foster family who wants to adopt them. They have lived with this family for over twenty months and, by all accounts, are doing well and are very bonded with the foster parents. The children have not had any contact with the grandparents for over a year and a half. The foster parents have commenced adoption proceedings; however, the underlying judge is awaiting the results of this appeal before proceeding with the adoptions.

## II.

## STANDARD OF REVIEW

This case originated as an abuse and neglect case filed by the DHHR against the biological parents of the children. However, the lower court's findings that the children were abused and neglected children by their parents is no longer a reviewable issue and is not addressed in this appeal. Rather, the matter before this Court involves the proper placement of the minor children. Generally,

> "[t]his Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo*." Syl. Pt. 4, *Burgess v. Porterfield,* 196 W. Va. 178, 469 S.E.2d 114 (1996).

7

Syl. pt. 1, *Napoleon S. v. Walker*, 217 W. Va. 254, 617 S.E.2d 801 (2005). Specifically, we are mindful that "[q]uestions relating to . . . custody of the children are within the sound discretion of the court and its action with respect to such matters will not be disturbed on appeal unless it clearly appears that such discretion has been abused." Syl., in part, *Nichols v. Nichols,* 160 W. Va. 514, 236 S.E.2d 36 (1977). Further, "[i]n . . . custody matters, we have traditionally held paramount the best interests of the child." Syl. pt. 5, in part, *Carter v. Carter*, 196 W. Va. 239, 470 S.E.2d 193 (1996).

To completely resolve the issues before us, we must consider the relevant statute. In this regard, we have held that "'[w]here the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review.' Syllabus point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995)." Syl. pt. 3, *Alden v. Harpers Ferry Police Civil Serv. Comm'n*, 209 W. Va. 83, 543 S.E.2d 364 (2001). Mindful of these applicable standards, we now consider the substantive issues herein raised.

## III.

## DISCUSSION

On appeal to this Court, the grandparents assert numerous and overlapping assignments of error. All of the appeal issues, however, can be placed into two broad

8

categories: (1) the sufficiency of the evidence, including evidentiary determinations by the circuit court; and (2) the application and mandate of W. Va. Code § 49-3-1(a)(3) (2001) (Repl. Vol. 2014).[3] We will discuss each of the general categories individually.

### A. Evidentiary Issues

First, we will address the evidentiary issues raised by the grandparents. The grandparents' protestations center around the baby swing and baby bassinet and the circuit court's finding that the same items from the meth-contaminated home were being used by the grandparents, as well as the grandparents' allegation that they were not allowed to introduce evidence at the hearing. Conversely, both the DHHR and the Guardian agree with the circuit court's determinations.

Many of the grandparents' arguments can be reduced to the contention that the circuit court's findings were not supported by adequate evidence. Our guiding standard is well-settled:

> Although conclusions of law reached by a circuit court are subject to a *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the

---

[3]We note that W. Va. Code § 49-3-1(a)(3) (2001) (Repl. Vol. 2014) was repealed and recodified during the 2015 Regular Session of the West Virginia Legislature. The new enactment, W. Va. Code § 49-4-114, has minor stylistic changes and will be effective ninety days after the February 19, 2015, approval date. See W. Va. Code § 49-1-103.

circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

Syl. pt. 1, *In the Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

As previously explained, the CPS worker was comparing photographs taken of baby items at the mother's meth-contaminated trailer with pictures of baby equipment taken at the grandparents' home. Based on the concern that the children were being exposed to items that had been tainted with meth, the DHHR filed its emergency motion to move the children's placement. The motion was granted, and a full hearing was held on April 15, 2013. At the hearing, the circuit court heard conflicting testimony from the DHHR and the grandparents regarding the baby equipment. After hearing the testimony, the circuit court stated that

I think it is the same bassinet. They both have a blue ribbon, in the upper picture . . . there are items laying over the ridge of the bassinet which cover up portions of the - - what would appear to be the blue ribbon. If you look clear to the extreme right, you see the blue ribbon going around the corner. I think it is the same one. I think it came out of that trailer. That is my finding.

10

Subsequent thereto, at the hearing on the grandparents' motion to intervene, the circuit court took judicial notice of the evidence from the April 15, 2013, emergency hearing. No parties objected to the circuit court's judicial notice of the evidence from the prior hearing.[4]

---

[4]Significantly, the grandparents assert that they were precluded from presenting relevant evidence on the matter of the baby equipment during the hearing on their motion to intervene. Our review of the hearing transcript, however, leads to the conclusion that such a complaint is disingenuous. Early in the hearing, the Guardian moved the circuit court to take judicial notice of the prior evidence on the issue of the baby items. The following exchange occurred between counsel for the grandparents and the circuit court judge:

> [GRANDPARENTS' COUNSEL]: . . . . So just so that I'm clear in my mind, Judge, I'm not allowed to inquire any further into any facts related to that?
>
> THE COURT: I'm not going to retry that issue, if that is what you mean.
>
> [GRANDPARENTS' COUNSEL]: Yes.
>
> THE COURT: Do you have additional evidence you want put in the record?
>
> [GRANDPARENTS' COUNSEL]: Yes.
>
> THE COURT: I will allow you to do that.
>
> [GRANDPARENTS' COUNSEL]: Okay.
>
> THE COURT: Is this your witness to do that [referring to the CPS worker who was on the stand]?
>
> [GRANDPARENTS' COUNSEL]: No, no.

After the witnesses testified, counsel for the grandparents, by way of proffer, argued to the circuit court:

(continued...)

11

Evidence was heard at two evidentiary hearings, wherein the grandparents could have introduced evidence to refute the photographic evidence submitted by the DHHR. The grandparents chose to rely on their own testimony and the proffered testimony of another individual. In situations concerning the credibility of witnesses, a circuit court's findings are

---

[4](...continued)
[GRANDPARENTS' COUNSEL]: Both [grandparents] would testify that - - as they have in the past - - that the furniture, the baby furniture the bassinet and the swing - - did not - - that was found, that was in their home, despite similarities in appearance, that these were not items that came from [the mother's] trailer.

[The grandfather] would testify further that he has been to [the mother's] trailer, and the bassinet and the swing that are . . . pictured as having come from [the mother's] trailer and being in the [grandparents'] home, that those items are still in the trailer. And that he has gone from [the mother's] old trailer, has seen those items in the trailer looking through the window, and returned to his home and the items are still in his home. Clearly, not the same items.

THE COURT: He already testified to that, didn't he.

[GRANDPARENTS' COUNSEL]: Well, they did originally, yes. . . . But, in addition, I have a witness . . . who accompanied [the grandfather] to the . . . trailer, and also looked through the window and saw the bassinet and swing there, and then from there immediately went to the [grandparents'] home and saw the similar items in the home.

And one additional witness . . . who is [the grandmother's] mother. She would testify that the high chair that was also in one of the photographs submitted by the Department was given to [the grandmother] by her[.] . . . That is the extent of the proffer, Judge.

12

afforded deference "because the trial judge was on the spot and is better able than an appellate court to decide whether the error affected substantial rights of the parties." *In Interest of Tiffany Marie S.*, 196 W. Va. at 237, n.26, 470 S.E.2d at 191, n.26. *See also In re Elizabeth Jo "Beth" H.*, 192 W. Va. 656, 659, 453 S.E.2d 639, 642 (1994) ("Consistent with our cases in other areas, we give appropriate deference to findings of the circuit court. In this regard, the circuit court has a superior sense of what actually transpired during an incident, by virtue of its ability to see and hear the witnesses who have firsthand knowledge of the events. Appellate oversight is therefore deferential, and we should review the circuit court's findings of fact following an evidentiary hearing under the clearly erroneous standard. If the circuit court makes no findings or applies the wrong legal standard, however, no deference attaches to such an application. Of course, if the circuit court's findings of fact are not clearly erroneous and the correct legal standard is applied, the circuit court's ultimate ruling will be affirmed as a matter of law."). The circuit court heard and considered all of the evidence and, as the finder of fact, determined that, although the grandparents proffered testimony concerning the bassinet and swing, there was no new evidence on which to reconsider its previous finding that the grandparents had knowingly exposed the children to meth-contaminated baby equipment. By using the tainted equipment, the circuit court found that the grandparents had exposed the children to the risk of imminent harm and that they lacked sufficient judgment to ensure the children's safety. The circuit court's factual rulings will not be disturbed by this Court.

## B. W. Va. Code § 49-3-1(a)(3) (2001) (Repl. Vol. 2014)

Having ascertained that the evidence was properly considered by the circuit court, we now turn our focus to the application of the grandparent preference statute. In this case, we are called upon to determine whether W. Va. Code § 49-3-1(a)(3) is mandatory, and, if so, whether the circuit court failed to follow the requirements set forth within the statute. The grandparents contend that the circuit court did not apply the statutory presumption in favor of grandparent placement and, further, failed to consider the results of a home study prior to making a placement determination. Conversely, the DHHR responds that the grandparents did not provide an approved home study, and, more importantly, because the circuit court found that the children were in imminent danger, it was not required to wait for a home study before removing the children from the grandparents' home.

W. Va. Code § 49-3-1(a)(3) provides, in pertinent part:

> For purposes of any placement of a child for adoption by the department, the department shall first consider the suitability and willingness of any known grandparent or grandparents to adopt the child. Once any such grandparents who are interested in adopting the child have been identified, the department shall conduct a home study evaluation, including home visits and individual interviews by a licensed social worker. If the department determines, based on the home study evaluation, that the grandparents would be suitable adoptive parents, it shall assure that the grandparents are offered the placement of the child prior to the consideration of any other prospective adoptive parents.

14

The first step in statutory construction is to identify the intent expressed by the Legislature in promulgating the provision at issue. "The primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syl. pt. 1, *Smith v. State Workmen's Comp. Comm'r*, 159 W. Va. 108, 219 S.E.2d 361 (1975). Next, we look to the particular language used by the Legislature. "Where the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation." Syl. pt. 2, *State v. Elder*, 152 W. Va. 571, 165 S.E.2d 108 (1968). *Accord* Syl. pt. 5, *State v. General Daniel Morgan Post No. 548, Veterans of Foreign Wars*, 144 W. Va. 137, 107 S.E.2d 353 (1959) ("When a statute is clear and unambiguous and the legislative intent is plain, the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute."). Finally,

> [i]t is the duty of a court to construe a statute according to its true intent, and give to it such construction as will uphold the law and further justice. It is as well the duty of a court to disregard a construction, though apparently warranted by the literal sense of the words in a statute, when such construction would lead to injustice and absurdity.

Syl. pt. 2, *Click v. Click*, 98 W. Va. 419, 127 S.E. 194 (1925). Appropriate for the present case, "[t]he law does not require a suitor to do a futile thing." Syl. pt. 2, *Brawley v. County Court of Kanawha Cnty.*, 117 W. Va. 697, 188 S.E. 139 (1936).

In examining this portion of the governing statutory law, this Court has recognized that, to effectuate the legislative intent, a circuit court "must endeavor to secure

15

for a child who has been removed from his or her family a permanent placement with the level of custody, care, commitment, nurturing and discipline that is consistent with the child's best interests." *See State v. Michael M.*, 202 W. Va. 350, 358, 504 S.E.2d 177, 185 (1998) (discussing legislative intent as stated in W. Va. Code § 49-1-1 (1999) (Repl. Vol. 2014)). The specific portion of the statute states: "[o]nce any such grandparents who are interested in adopting the child have been identified, the department *shall* conduct a home study evaluation[.]" W. Va. Code § 49-3-1(a)(3) (emphasis added). "'It is well established that the word "shall," in the absence of language in the statute showing a contrary intent on the part of the Legislature, should be afforded a mandatory connotation.' Syllabus Point 1, *Nelson v. West Virginia Public Employees Insurance Board*, 171 W. Va. 445, 300 S.E.2d 86 (1982)." Syl. pt. 1, *E.H. v. Matin*, 201 W. Va. 463, 498 S.E.2d 35 (1997). Having determined the legislative intent of the statute and found that the wording is clear and unambiguous, we now specifically hold that the mandatory language of W. Va. Code § 49-3-1(a)(3) (2001) (Repl. Vol. 2014) requires that a home study evaluation be conducted by the West Virginia Department of Health and Human Resources to determine if any interested grandparent would be a suitable adoptive parent.

However, resolution of this case does not come simply by interpreting the statute. Rather, this statute must be applied to the peculiar facts of the present case. We have determined that a home study is a required mandate when a grandparent expresses interest

16

in adopting a child. However, the home study obligation also must comport with the ultimate determination of child placement premised upon the best interests of the child. *See* Syl. pt. 4, *Napoleon S. v. Walker*, 217 W. Va. 254, 617 S.E.2d 801 (2005) ("West Virginia Code § 49-3-1(a) provides for grandparent preference in determining adoptive placement for a child where parental rights have been terminated and also incorporates a best interests analysis within that determination by including the requirement that the DHHR find that the grandparents would be suitable adoptive parents prior to granting custody to the grandparents. The statute contemplates that placement with grandparents is presumptively in the best interests of the child, and the preference for grandparent placement may be overcome only where the record reviewed in its entirety establishes that such placement is not in the best interests of the child."); Syl. pt. 5, *Napolean*, *id.* ("By specifying in West Virginia Code § 49-3-1(a)(3) that the home study must show that the grandparents 'would be suitable adoptive parents,' the Legislature has implicitly included the requirement for an analysis by the Department of Health and Human Resources and circuit courts of the best interests of the child, given all circumstances of the case.").

As this Court consistently has reiterated, in all cases involving children, the polar star is the best interests of the child. "[A] crucial component of the grandparent preference is that the adoptive placement of the subject child with his/her grandparents must serve the child's best interests. Absent such a finding, adoptive placement with the child's

17

grandparents is not proper." *In re Elizabeth F.*, 225 W. Va. 780, 786, 696 S.E.2d 296, 302 (2010). A determination of the child's best interests must be based on all of the circumstances of the case. *See generally In re Hunter H.*, 231 W. Va. 118, 744 S.E.2d 228 (2011). Adoption by a child's grandparents is permitted only if such adoptive placement serves the child's best interests based upon a thorough review of the entire record. *See In re Aaron H.*, 229 W. Va. 677, 735 S.E.2d 274 (2012); *see also In re N.P.*, No. 11-0324, 2011 WL 8199162 (W. Va. Oct. 25, 2011) (unpublished mem. dec.).

Significantly, the lower court in this case found that the children were in danger of imminent harm. Protection of children is one of the most defended principles by this Court. *See* W. Va. Code § 49-4-105 (allowing removal of child from home and foregoing requirement for hearing on reasonable efforts to maintain the family when child appears in imminent danger of serious bodily or emotional injury or death in any home). *See also* W. Va. R.P. for Child Abuse and Neglect Procs. 16 (authorizing circuit court to place custody of a child with the DHHR at any time when the child is thought to be in imminent danger). "'[C]ourts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened . . . .' Syl. Pt. 1, in part, *In re R.J.M.*, 164 W. Va. 496, 266 S.E.2d 114 (1980)." Syl. pt. 7, in part, *In the Interest of Carlita B.*, 185 W. Va. 613, 408 S.E.2d 365 (1991). By way of example, this Court recently found that the circuit court in an abuse and

18

neglect proceeding did not abuse its discretion in not requiring completion of a home study of a mother's adult daughter for the children's placement when it was clear that the adult daughter was not a suitable placement. *In the Interest of J.M.*, No. 11-1165, 2012 WL 2988787 (W. Va. Mar. 12, 2012) (unpublished mem. dec.). Moreover, this Court has affirmed a lower court's denial of grandparent placement, in the absence of a home study, because the circuit court's decision was not based solely on the lack of a completed home study but also, on other factors, including the length and quality of time the child had lived in the home of the foster parents. *In re Aaron H.*, 229 W. Va. 677, 735 S.E.2d 274 (2012). Additionally, this Court again affirmed a circuit court's finding that occurred in spite of a lack of a home study in the case *In re S.S.*, No. 14-1039, 2015 WL 1332668 (W. Va. Mar. 16, 2015) (unpublished mem. dec.), based upon the court's finding that a home study was unnecessary given that evidence regarding the grandmother's substance abuse enabled the circuit court to determine her suitability as a potential adoptive parent. Notwithstanding this Court's concern over the lack of a home study, especially given the mandatory language of the statute, we recognize that the safety of children is of utmost importance, taking into account the totality of the circumstances and the best interests of the children. In circumstances where it is apparent that an interested grandparent would fail to be found as a suitable placement for a minor child, the charade of continuing a home study is not necessary, and, in fact, could be harmful. *See* Syl. pt. 2, *Newhart v. Pennybacker*, 120 W. Va. 774, 200 S.E. 350 (1938) ("Where a particular construction of a statute would result

19

in an absurdity, some other reasonable construction, which will not produce such absurdity, will be made."). Accordingly, we now expressly hold that while the grandparent preference statute, at W. Va. Code § 49-3-1(a)(3) (2001) (Repl. Vol. 2014), places a mandatory duty on the West Virginia Department of Health and Human Resources to complete a home study before a child may be placed for adoption with an interested grandparent, "the department shall first consider the [grandparent's] suitability and willingness . . . to adopt the child." There is no statutory requirement that a home study be completed in the event that the interested grandparent is found to be an unsuitable adoptive placement and that placement with such grandparent is not in the best interests of the child.

In the instant case, the minor children were placed with the interested grandparents before a home study had been completed. During the pendency of the home study evaluation process,[5] the DHHR filed an emergency motion based upon its concern with

_____

[5]It is noted that a previous home study had been completed on the grandparents' home. In 2010, during a prior abuse and neglect case, the DHHR submitted a completed home study evaluation, which approved placement of petitioners' grandchild, H.T., in their home. The placement is "approved with concerns" due to prior CPS issues in the home. Because of the age of the 2010 home study, a new home study was undertaken. The new home study had not been completed at the time of the circuit court's denial of the grandparents' placement request in the present case. This Court was informed of the study's findings through a supplemental appendix. The supplement included a letter dated and signed by Lori Hesson of KVC Behavioral Healthcare. The letter stated that the grandparents previously worked with KVC in efforts to obtain custody of L.M. and L.S. The letter stated that the grandparents attended all required trainings, background checks, and home visits. The letter further explained that KVC had been prepared to approve petitioners' home as an

(continued...)

20

the health and safety of the children. After hearing evidence at both the emergency hearing and at the hearing on the grandparents' motion to intervene and for placement of the minor children, the circuit court found that "[t]he presumption in favor of placement with the grandparents has been rebutted in this case, based on clear and convincing evidence that the grandparents have exposed the children to the risk of imminent harm and lack sufficient judgment to ensure the children's safety." The circuit court expressed that it "considered the best interests of the children, including their need for continuity of care and caretakers, and their opportunity for adoption in a stable home environment." This Court affirms the circuit court's determination that the grandparents were not an appropriate adoptive placement for the minor children.

## IV.

## CONCLUSION

For the foregoing reasons, we affirm the December 19, 2013, order of the Circuit Court of Calhoun County.

---

[5](...continued)
approved placement; however, KVC then received information regarding the "extensive criminal and CPS history of their children and the current concerns with their grandchildren with whom they have legal guardianship." KVC, accordingly, expressed that the grandparents' home is denied as a proper placement for the children at issue herein.

Affirmed.