**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**


*In re* **L.T. and I.T.**

**No. 24-29** (Randolph County CC-42-2021-JA-7 and CC-42-2021-JA-31)


## MEMORANDUM DECISION


Petitioner Grandmother R.C.[1] appeals the Circuit Court of Randolph County's December 14, 2023, order denying her motion to intervene and motion for placement of L.T. and I.T.,[2] arguing that the court erred in denying her permanent placement of the children and failing to require compliance with relevant statutes regarding placement of children in abuse and neglect proceedings. Upon our review, we determine that oral argument is unnecessary and that a memorandum decision affirming the circuit court's order is appropriate. *See* W. Va. R. App. P. 21.

We begin by noting that the record on appeal is limited because the petitioner was not granted intervenor status in the proceedings below. In February 2021, the DHS filed an abuse and neglect petition against the mother and father of L.T.[3] The DHS filed an amended petition in April 2021 after the birth of I.T. The father's parental rights were terminated in May 2022, and the mother's parental rights were later terminated in August 2022.[4]

---

[1] The petitioner appears by counsel Shannon R. Thomas. The West Virginia Department of Human Services appears by counsel Attorney General John B. McCuskey and Assistant Attorney General Katherine A. Campbell. Because a new Attorney General took office while this appeal was pending, his name has been substituted as counsel. Counsel Heather M. Weese appears as the children's guardian ad litem ("guardian"). Respondent A.M. appears by counsel Morris C. Davis.

Additionally, pursuant to West Virginia Code § 5F-2-1a, the agency formerly known as the West Virginia Department of Health and Human Resources was terminated. It is now three separate agencies—the Department of Health Facilities, the Department of Health, and the Department of Human Services. *See* W. Va. Code § 5F-1-2. For purposes of abuse and neglect appeals, the agency is now the Department of Human Services ("DHS").

[2] We use initials where necessary to protect the identities of those involved in this case. *See* W. Va. R. App. P. 40(e).

[3] The petition also alleged abuse and neglect of other children not at issue in this appeal.

[4] The mother appealed the termination of her rights, and this Court affirmed that termination. *See In re L.T., G.R., M.R., J.M., X.M., A.M., M.M., and I.T.*, No. 22-692, 2023 WL 6144930 (W. Va. Sept. 20, 2023) (memorandum decision).

1

In March 2022, while the abuse and neglect proceedings were ongoing, the petitioner filed a motion to intervene in which she also sought placement of the children. In her motion, the petitioner alleged that she first contacted Child Protective Services ("CPS") about obtaining custody of L.T. in February 2021, but was never awarded placement. According to the petitioner, she later requested custody of I.T. as well. The petitioner filed a second motion to intervene also seeking placement of the children in June 2023. After retaining counsel, the petitioner filed a third motion to intervene in August 2023.

Thereafter, the guardian filed an objection to the petitioner's motions. According to the objection, after the DHS filed the initial petition in 2021, both the DHS and guardian determined that the petitioner was not a suitable adoptive parent. This determination was based on several factors, including that the children's mother was opposed to placement with the petitioner because of the petitioner's alleged maltreatment of her as a child. According to the mother, the petitioner "sent her off to live with her father as a child, knowing he was an alcoholic" and that she was sexually abused in the father's care. The guardian further argued that two of the older children who are not at issue in this appeal did not want to live with the petitioner and that the petitioner had no bond with any of the children. Finally, the guardian noted that the petitioner admitted to finding "inappropriate pornographic materials" on her husband's phone, which prompted her to take the device to the police to investigate. Although law enforcement "told her the [individuals depicted in the pornography] did not appear underage," the petitioner nonetheless claimed to have separated from her husband. However, after the mother of L.T. and I.T. saw the petitioner and her husband together, the petitioner admitted to CPS that "they were still married and working things out." Accordingly, the guardian argued that placement with the petitioner was still not consistent with the best interests of the children, especially given the stability the children achieved together in their foster home.

The circuit court held a hearing on the petitioner's motions in November 2023. The petitioner testified and explained that she contacted CPS shortly after the children were removed and filled out paperwork to seek placement of the children. The petitioner claimed that she continued contacting CPS but never received any updates. The petitioner admitted that she had no bond with the children, as she testified that she only met L.T. four times for a few hours each time and never met I.T. She also stated that the CPS worker inquired about the petitioner taking custody of an older sibling of the children, but the petitioner refused. She explained she rejected placement of the sibling because she assumed she would be getting custody of L.T. and I.T. and did not want the sibling around the children because of his behavioral issues. A former CPS worker who handled the case testified that she did not recall meeting with the petitioner or completing paperwork regarding placement with the petitioner, but she did recall having phone calls with the petitioner. The worker explained that the children were not initially placed with the petitioner because the children's mother did not want the petitioner to have placement. In fact, the mother "begged" the DHS not to place the children in the petitioner's care. Despite the mother's request, the worker asked the petitioner to take placement of a sibling of L.T. and I.T. in June 2021 because the DHS had trouble securing placement for this child. However, the petitioner refused to take the child because of his behavioral issues. The worker clarified that this child did not exhibit any behavioral issues upon removal and the petitioner's refusal to care for this child raised concerns for the DHS. Regardless, the DHS did not pursue placement of this older sibling with the petitioner after the

child described the petitioner as "mean" and asked not to be placed in her home. Further, several other older siblings informed the worker that they either had no relationship with their grandmother or did not want one. The worker explained that she did not have access to the case file because she was no longer employed there but that she "guessed" the file did not contain any notations about contact with the petitioner.

Both the petitioner and the CPS worker testified and gave differing testimony as to an October 2021 multidisciplinary team ("MDT") meeting where the parties discussed the petitioner discovering pornography on her husband's phone. The petitioner testified that she was concerned about the pornography and "wasn't sure what it was," so she took the phone to the police. She further testified that the police looked at the materials, determined that it was "nothing more than adult porn," and took no action. In contrast, the worker testified that the petitioner stated that she kicked her husband out after she "caught him watching kiddy porn." The CPS worker explained that the petitioner was initially dishonest about continued contact with her husband but later admitted that they were "working things out" after being confronted with information that the petitioner and her husband were seen together. Additionally, a religious counselor testified to providing marital counseling to the petitioner and her husband, resulting in their eventual reconciliation in the fall of 2022.

The petitioner testified that she left the meeting believing she was still being considered for placement of the children, but would need to wait until the mother's parental rights were terminated before she could seek visitation or placement. However, the CPS worker testified that, during the MDT meeting, she explained that the petitioner was not being considered for placement due to her continuing relationship with her husband, who she believed to have watched "kiddy porn"; the mother strongly requesting that no children be placed with the petitioner because she mistreated the mother as a child; and the petitioner's reluctance to take care of a child with behavioral issues. According to the worker, the DHS had concerns about placing children in a home that contained inappropriate sexual material, especially considering that the case against the parents concerned sexual abuse. Finally, the court heard from the children's foster parent, who testified to the care she provided over approximately two years. According to the foster parent, the children viewed her as their mother and were bonded to her and her extended family.

Ultimately, the circuit court denied the petitioner's motion to intervene and motion for placement of the children by order entered on December 14, 2023. The court found that the DHS correctly determined that the petitioner was not an appropriate placement for the children, given that the investigation into her home "was riddled with red flags." The court also found that, although the petitioner claimed that the pornography her husband was viewing was not illegal, it was concerning enough that she "felt it was necessary to consult with law enforcement" and temporarily separate from him. According to the court, the DHS correctly determined that the home was not an appropriate placement because it would be contrary to the children's best interests "to be placed in any home . . . where inappropriate sexual material was or had been an issue." The court also highlighted concern over the petitioner's lack of candor about her ongoing relationship with her husband. Further, the court found that the petitioner's testimony regarding the MDT meeting lacked credibility, given the CPS worker's testimony to the contrary. The court then found that the petitioner had not established a bond with either child and that it was contrary to the children's best interests to remove them from their foster home due to the significant bonds formed.

In fact, the court found that the foster parent's home was "the only home I.T. has ever known" and that both children had thrived in their extended care in that home. The court also found that the DHS correctly denied the petitioner a home study after determining that she was not a suitable placement. It is from this order that the petitioner appeals.[5]

On appeal from a final order in an abuse and neglect proceeding, this Court reviews the circuit court's findings of fact for clear error and its conclusions of law de novo. Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).[6] Before this Court, the petitioner raises several assignments of error that ultimately concern the denial of her request for permanent custody of the two children at issue.[7] According to the petitioner, the circuit court erred in denying her permanent placement of the children and violated the grandparent preference set forth in West Virginia Code § 49-4-114(a)(3) by failing to require the DHS to conduct a home study of her residence. However, the petitioner ignores the following:

> While the grandparent preference statute . . . places a mandatory duty on the West Virginia Department of [Human Services] to complete a home study before a child may be placed for adoption with an interested grandparent, "the department shall first consider the [grandparent's] suitability and willingness . . . to adopt the child." There is no statutory requirement that a home study be completed in the event that the interested grandparent is found to be an unsuitable adoptive placement and that placement with such grandparent is not in the best interests of the child.

Syl. Pt. 10, in part, *In re L.M.*, 235 W. Va. 436, 774 S.E.2d 517 (2015); *see also In re M.F.*, 250 W. Va. 338, --, 902 S.E.2d 887, 894 (2024) ("[A]n assessment of a grandparent's suitability as an adoptive placement may be determinative of the need for the grandparent's further evaluation through a home study . . . ."). Here, the court heard extensive testimony supporting the DHS's determination that the petitioner was an unsuitable placement in the absence of a home study, including the mother's allegations of past maltreatment by the petitioner, issues concerning inappropriate sexual material in her home, the petitioner's dishonesty regarding her separation from her husband, and evidence of her lack of a relationship with, and treatment of, her other

---

[5] The permanency plan for the children is adoption in their current placement.

[6] The petitioner does not substantively challenge the denial of her motions to intervene. As such, we address only the denial of her request for permanent placement of the children.

[7] The petitioner additionally cites to West Virginia Code § 49-2-127 to argue that the circuit court "erred by not providing [her] with a timely opportunity to be heard on her request for intervention and placement." The petitioner's reliance on this statute, however, is misplaced, as it clearly establishes rights for "[f]oster parents and kinship parents." According to West Virginia Code § 49-1-206, "'[f]oster parent' means," in relevant part, "a person with whom the department has placed a child," while "'[k]inship parent' means a person with whom the department has placed a child to provide a kinship placement." The petitioner makes no attempt to explain how she satisfies either definition, as she readily admits that she has never exercised custody of either child. As such, she is entitled to no relief based on this statute.

4

grandchildren. On appeal, the petitioner attacks these findings by questioning the credibility of the CPS worker who testified below. However, we reject the petitioner's assertions that her own testimony was more credible on these issues, given that the court expressly rejected the petitioner's testimony in favor of that of the CPS worker.[8] *See Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997) ("A reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations."). Accordingly, it is clear that the circuit court did not err in denying the petitioner permanent placement of the children in the absence of a home study.

The petitioner further argues that the circuit court's ultimate decision to deny her placement of the children was impacted by the DHS's failure to comply with certain statutes earlier in the proceedings. Specifically, the petitioner cites to West Virginia Code § 49-4-601a, which requires that, after removing a child from their home, "placement preference is to be given to relatives . . . of the child." That statute further requires the DHS to undertake a search for relatives, file a list of all relatives known to the DHS, and file the results of its investigation into whether any relative is willing and able to act as a foster parent. The petitioner spends a considerable portion of her brief before this Court arguing that the DHS did not comply with this statute[9] and that the alleged failure to comply resulted in her being denied permanent placement of the children. We disagree, however, as the DHS's initial determination regarding the petitioner's unsuitability rendered strict

---

[8] Regarding the court's determination that the petitioner's testimony lacked credibility, we note that the court relied upon documents not admitted into evidence. Specifically, the petitioner attempted to admit into evidence handwritten notes she prepared during an MDT meeting. However, the DHS and guardian objected, and the court denied the admission of the notes. Despite this ruling, the court later relied on the petitioner's notes to conclude that her contemporaneous understanding of the MDT meeting conflicted with her testimony about the meeting. Although the petitioner raises an assignment of error attacking the court's reliance on these notes, we decline to address the arguments presented therein because, even absent the court's reliance on the notes, it was free to make determinations as to the petitioner's credibility. Further, the record is clear that the court based its credibility determinations on several factors other than the notes in question, including the petitioner being so concerned about the pornography on her husband's phone that she took it to the police, despite claiming that she was completely unfamiliar with pornography; her admitted lack of candor with the DHS regarding her ongoing relationship with her husband; and the CPS worker's testimony concerning the MDT meeting conflicting with the petitioner's version of events. As such, it is unnecessary to address the petitioner's assignment of error regarding the court's reliance on these documents solely on the issue of the petitioner's credibility.

[9] In support of her position that the DHS failed to file the documents required by West Virginia Code § 49-4-601a, the petitioner cites only to the docket sheet for the proceedings below. Given that the petitioner was denied intervenor status, she could not access the full case file below, and, therefore, it is unclear if the DHS failed in this regard. Further, the DHS does not indicate that it filed the necessary documents required by this statute. Regardless, it is unnecessary to determine if the DHS did, in fact, file the required documents, given the analysis above concerning the petitioner's unsuitability.

compliance with these statutes regarding the petitioner unnecessary. Indeed, as the record shows, the mother begged the DHS not to place the children with the petitioner upon removal given that she alleged past maltreatment by the petitioner. Further, as the proceedings progressed, the DHS was met with additional disqualifying information, such as the petitioner's concerns about inappropriate pornographic material in her home and her dishonesty concerning her ongoing relationship with her husband. As we have previously explained,

> bureaucratic errors and delays cannot dictate the outcome of a case where a child's future is at stake. As we have long held, "the primary goal in cases involving abuse and neglect . . . must be the health and welfare of the children." Syl. Pt. 3, in part, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996).

*In re G.G.*, 249 W. Va. 496, 506-07, 896 S.E.2d 662, 672-73 (2023). Under the specific circumstances of this case, we conclude that even if the petitioner is correct that the DHS failed to strictly comply with the requirements of these statutes, the DHS's determination that she was not a suitable placement was sufficient to deny her placement of the children.[10]

Ultimately, we conclude that the court denying the petitioner permanent placement of the children was appropriate. As we have explained, the grandparent preference "is not absolute" because "the child's best interest remains paramount." *In re K.E.*, 240 W. Va. 220, 225, 809 S.E.2d 531, 536 (2018). Indeed, "the preference for grandparent placement may be overcome only where the record reviewed in its entirety establishes that such placement is not in the best interests of the child." *Id*. (quoting Syl. Pt. 4, *Napoleon S. v. Walker*, 217 W. Va. 254, 617 S.E.2d 801 (2005)). As set forth above, the DHS introduced extensive evidence that placement with the petitioner was not in the children's best interests. Additionally, the court made ample findings to this effect. Critically, the court found that the children thrived in the foster parent's extended care, were

---

[10] The petitioner raises an additional assignment of error concerning West Virginia Code § 49-5-102, requiring that the DHS preserve records. However, the petitioner's basis for this argument is her own testimony, which we again note the circuit court found lacked credibility. In short, the petitioner's testimony as to alleged documents she completed is insufficient to establish that such documents existed or that the DHS failed to retain these documents in violation of West Virginia Code § 49-5-102. Further, the petitioner raises an assignment of error in which she alleges that the DHS failed to follow its established policies. However, we note that the petitioner cites to policies that are duplicative of statutes addressed above, such as the preference for placement of children with grandparents and requirements concerning identification of potential relative placements. Given that we find no error on the basis of a violation of any of these statutes as set forth above, the petitioner is similarly entitled to no relief in regard to allegations of violations of these duplicative policies. Finally, the petitioner raises an assignment of error in which she attacks the circuit court's granting of intervenor status to the children's foster parent. However, the petitioner readily admits that she lacks standing to challenge the court's decision on this issue. We agree, as the petitioner was not a party to the proceedings below. *See In re H.W.*, 247 W. Va. 109, 120, 875 S.E.2d 247, 258 (2022) (explaining that non-parties, including foster parents who were denied intervention "do not have standing to challenge the further rulings of the circuit court concerning the underlying abuse and neglect case"). As such, we decline to address these assignments of error.

bonded with her, and would not have benefitted from removal from that home. As we have explained, "[q]uestions relating to . . . custody of the children are within the sound discretion of the court [and] its action with respect to such matters will not be disturbed on appeal unless it clearly appears that such discretion has been abused." Syl. Pt. 2, *In re G.G.*, 249 W. Va. 496, 896 S.E.2d 662 (2023) (quoting Syl., in part, *Nichols v. Nichols*, 160 W. Va. 514, 236 S.E.2d 36 (1977)). Based on the foregoing, it is clear that the circuit court did not abuse its discretion in denying the petitioner permanent placement of the children.

Accordingly, we find no error in the decision of the circuit court, and its December 14, 2023, order is hereby affirmed.

Affirmed.

**ISSUED**: May 13, 2025

**CONCURRED IN BY**:

Justice Elizabeth D. Walker
Justice Tim Armstead
Justice C. Haley Bunn

**DISSENTING:**

Chief Justice William R. Wooton
Justice Charles S. Trump IV

Wooton, Chief Justice, with whom Justice Trump joins, dissenting:

I respectfully dissent, as I believe that the failure of the respondent, Department of Human Services ("DHS"), to do a home study denied the petitioner, Grandmother R.C. ("grandmother"), her statutory rights and led inexorably to a result that was fundamentally unfair to her.

I begin where all sound legal analyses should begin: with the governing law. West Virginia Code § 49-4-114(a)(3) provides that

> [f]or purposes of any placement of a child for adoption by the department, the department *shall* first consider the suitability and willingness of any known grandparent or grandparents to adopt the child. Once grandparents who are interested in adopting the child have been identified, the department shall conduct a home study evaluation, including home visits and individual interviews by a licensed social worker. If the department determines, based on the home study evaluation, that the grandparents would be suitable adoptive parents, it shall assure that the grandparents are offered the placement of the child prior to the consideration of any other

7

> prospective adoptive parents. A circuit judge may determine the
> placement of a child for adoption by a grandparent or grandparents
> is in the best interest of the child without the grandparent or
> grandparents completing or passing a home study evaluation.

(Emphasis added). Lest there be any question about the Legislature's intent in directing that a home study evaluation "shall" be done, *id*. § 49-4-114(a)(3), this Court has held that "[t]he mandatory language of [the predecessor statute][1] requires that a home study evaluation be conducted by the West Virginia Department of Health and Human Resources to determine if any interested grandparent would be a suitable adoptive parent." Syl. Pt. 9, *In re L.M*., 235 W. Va. 436, 774 S.E.2d 517, 520 (2015). The requirement of a home study ensures that DHS's recommendation as to the suitability of the grandparents will be based on timely, first-hand observation and information-gathering, not on hearsay allegations from unvetted sources; and that the findings and conclusions of the circuit court on this critical issue will be based on something other than hazy recollections long after the fact.

As support for its affirmance of the circuit court's judgment in this case, the majority cites several cases in which this Court has excused DHS's failure to do a home study. *See* Syl. Pt. 10, in part, *In re L.M*., 235 W. Va. 436, 774 S.E.2d 517 (2015) ("There is no statutory requirement that a home study be completed in the event that the interested grandparent is found to be an unsuitable adoptive placement and that placement with such grandparent is not in the best interests of the child."); *see also In re M.F*., 250 W. Va. 338, __, 902 S.E.2d 887, 894 (2024) ("an assessment of a grandparent's suitability as an adoptive placement may be determinative of the need for the grandparent's further evaluation through a home study[.]"). However, these cases are so clearly distinguishable that they cannot possibly serve as justification for DHS's failure to conduct a home study to determine whether the petitioner's home would be a suitable placement for the children.

In *L.M*., the petitioners' grandson, L.M., had already been placed in their home after he had been removed from his parents' custody. 235 W. Va. at 440, 774 S.E.2d at 521. Shortly after the petitioners' newborn granddaughter, L.S., was also placed in their home, a Child Protective Services ("CPS") worker made an unannounced visit and took pictures which showed the presence of a bassinet and baby swing "that had been contaminated in an unremediated meth environment[.]"[2] *Id*. Following a hearing on DHS's motion to remove the children from petitioners' home, the circuit court found that "[t]he presumption in favor of placement with the grandparents has been rebutted in this case, based on clear and convincing evidence that the grandparents have exposed the children to the risk of imminent harm and lack sufficient judgment to ensure the children's safety." *Id*. at 441, 774 S.E.2d at 522. In short, in *L.M*. the issue of suitability was raised early in the proceedings, when memories were fresh; the petitioners had a

---

[1] In *L.M*., the Court cited the predecessor statute, West Virginia Code section 49-3-1(a)(3), which was operative at the time of the events underlying the case. The predecessor statute was recodified by Acts 2015, C. 46, effective February 16, 2015, operative May 17, 2015. The recodified statute, *see supra*, was not materially altered.

[2] The parents had been utilizing their home as a meth lab.

full and fair opportunity to make their case for placement at that time; and the circuit court's decision was based on the CPS worker's first-hand observations in the home – observations that were supported by photographic evidence. Under these circumstances, a home study could reasonably be deemed unnecessary, and DHS's failure to conduct one caused no prejudice to the petitioners.

In *M.F.*, a case where the child's father had killed his mother, DHS failed to do a home study to determine the suitability of placement with his paternal grandparents in the apparent belief – in the absence of any attempt to look into the grandparents' suitability for placement – that it was in the child's best interests to remain with his maternal aunt. This Court reversed, concluding that

> [b]ecause the DHS has not complied with the statutory directive of first considering the suitability of the Grandparents as an adoptive placement for M.F. III, we find it necessary to remand this case, in part, with directions to the circuit court to order the DHS to comply with the requirements of West Virginia Code § 49-4-114(a)(3).

250 W. Va. at 345, 902 S.E.2d at 894. I cannot agree that in the instant case DHS had "first consider[ed] the suitability of the [petitioner] as an adoptive placement[,]" *Id*., at the time petitioner indicated her interest in taking the children – which, it will be recalled, was in February, 2021, almost three years before a hearing was ever held to determine this critical issue. In February, 2021, the DHS knew only one thing: that the children's mother objected to their placement with the petitioner; in that regard, the mother made several allegations which could have been investigated, and either proved or disproved, if a home study had been done. Some time thereafter, the petitioner told the children's guardian ad litem ("GAL") that she had separated from her husband because he had "inappropriate materials" on his phone, and that she had taken the phone to have those materials examined by the West Virginia State Police ("WVSP"), who determined that the images were pornographic images of individuals who "did not appear underage." Again, all of this could have been investigated, and either proved or disproved, if a home study had been done. A study could, and probably would, have established (1) whether the husband had indeed been kicked out of the home; (2) whether he and the petitioner had eventually reconciled; and (3) if so, whether it was a condition of the reconciliation that petitioner jettison all of his pornographic images.[3] Instead, the petitioner was forced to litigate these issues almost three years later, by which time the petitioner and the GAL had different recollections as to how the petitioner had described the images – an issue which, although completely immaterial, *see supra* note 3, was crucial to the circuit court's credibility determinations.

An additional factor that weighs heavily against any finding that no home study was necessary because DHS had "first consider[ed] the suitability of the [petitioner] as an adoptive placement[,]" *M.F.*, 250 W. Va. at 345, 902 S.E.2d at 894, is the undisputed fact that DHS inquired as to whether the petitioner would take custody of the oldest grandchild, a boy who had behavioral

---

[3] It appears to be undisputed that the petitioner did take her husband's phone to the WVSP for examination and that the WVSP thereafter returned the phone without taking any action, from which it may reasonably be inferred that there were no pornographic images of children on the phone.

issues. The petitioner refused, explaining that she rejected this placement because she assumed the younger children would also be placed with her and she was concerned about having the older child around them.

Finally, and critically, in both *L.M.* and *M.F.*, as well as in the instant case, the Court's focus has been on whether DHS's failure to do a home study can be justified on the ground that DHS already had reason to believe that an interested grandparent was not a suitable placement. In so doing, we are in danger of normalizing DHS's failure to follow the statutory mandate: that a home study is to be done in order to "*determine[], based on the home study evaluation*, that the grandparents would be suitable adoptive parents[.]" *See* W. Va. Code § 49-4-114(a)(3) (emphasis added). In my view, it should be the very rare case in which DHS can be permitted to pre-judge the merits of a grandparent's application and thus obviate its statutory duty to do a home study. The instant case is a textbook example of the cascading unfairness that can result when DHS prejudges the merits of a grandparent's request for placement; fails to do a home study as required by law; allows the case to drag on for years while thwarting the grandparent's multiple attempts to intervene; fails to document petitioner's multiple contacts and requests for information; fails to arrange any visitation for the grandparent; and then attempts to justify its inaction on the ground that the best interests of the children are now served by remaining with their foster parents, with whom they've formed a bond.

In summary, DHS had no basis on which to conclude, in the absence of anything other than information provided by a source whose reliability was at best questionable, that the petitioner was not a suitable placement for her grandchildren and that a home study was therefore not necessary. Under the facts and circumstances of this case, it was DHS's mandatory duty to do a home study pursuant to West Virginia Code section 49-4-114(a)(3), in order to make a fair assessment of the petitioner's suitability for placement, and its failure to do the study severely prejudiced the petitioner. Viewing the record in this case, I am convinced that the petitioner did not get a fair shake; simply put, the system failed her.

Accordingly, I respectfully dissent. I am authorized to state that Justice Trump joins in these dissenting views.