# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

## January 2020 Term

**FILED**

**June 15, 2020**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 19-1089

*IN RE*: J.P.

_____

**Appeal from the Circuit Court of Berkeley County
The Honorable Bridget M. Cohee, Judge
Civil Action No. 18-JA-89**

**REVERSED AND REMANDED**
_____

**Submitted: May 20, 2020
Filed: June 15, 2020**

**Christian Riddell
Riddell Law Group
Martinsburg, West Virginia
Attorney for the Petitioners, Paternal
Grandfather, C.P. and Maternal
Grandmother, S.D.**

**Patrick Morrisey
Attorney General
Lee Niezgoda
Assistant Attorney General
Charleston, West Virginia
Attorneys for the Respondent,
West Virginia Department of Health
and Human Resources**

**Elizabeth Layne Diehl
Diehl Law PLLC
Martinsburg, West Virginia
Guardian Ad Litem for the
Minor Child, J.P.**

**Stephanie E. Scales-Sherrin
Scales Law Office
Martinsburg, West Virginia
Attorney for the Respondents,
Foster Parents, R.M. & A.M.**

**JUSTICE JENKINS delivered the Opinion of the Court.**

**JUSTICE HUTCHISON dissents and reserves the right to file a separate opinion.**

**JUSTICE WORKMAN not participating.**

**SYLLABUS BY THE COURT**

1.    "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous.  A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.  However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syllabus point 1, *In Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

2.    "West Virginia Code § 49-3-1(a) provides for grandparent preference in determining adoptive placement for a child where parental rights have been terminated and also incorporates a best interests analysis within that determination by including the requirement that the DHHR find that the grandparents would be suitable adoptive parents prior to granting custody to the grandparents. The statute contemplates that placement with grandparents is presumptively in the best interests of the child, and the preference for grandparent placement may be overcome only where the record reviewed in its entirety

i

establishes that such placement is not in the best interests of the child." Syllabus point 4, *Napoleon S. v. Walker*, 217 W. Va. 254, 617 S.E.2d 801 (2005).

3.    "By specifying in West Virginia Code § 49-3-1(a)(3) that the home study must show that the grandparents 'would be suitable adoptive parents,' the Legislature has implicitly included the requirement for an analysis by the Department of Health and Human Resources and circuit courts of the best interests of the child, given all circumstances of the case."  Syllabus point 5, *Napoleon S. v. Walker*, 217 W. Va. 254, 617 S.E.2d 801 (2005).

**Jenkins, Justice:**

This is an appeal by Petitioners[1] C.P. ("Paternal Grandfather"), the minor child J.P.'s[2] paternal grandfather, and S.D. ("Maternal Grandmother"), J.P.'s maternal grandmother, from a final order entered October 28, 2019, by the Circuit Court of Berkeley County. By that order, the circuit court permanently placed the minor child[3] with R.M. and A.M. ("Foster Parents") instead of with an appropriate grandparent. On appeal, Petitioners claim that the circuit court disregarded the statutory grandparent preference under West Virginia Code § 49-4-114(a)(3) (LexisNexis 2015) by placing the child with the Foster Parents because (1) Paternal Grandfather was a fit caretaker; (2) bureaucratic failures of the state agencies of West Virginia and Pennsylvania led to the child staying with the Foster Parents for an extended period of time while waiting for Paternal Grandfather's home study to be completed; and (3) placement with Paternal Grandfather is in the child's best interest. Accordingly, we find that the circuit court erred by not adhering to the grandparent preference in this case where bureaucratic delays caused the child to remain in the home of the foster family for an extended period of time, and where there has been no showing that Paternal Grandfather is unfit or that such placement is not

---

[1] Where necessary, the grandparents also will be referred to collectively as "the Petitioners."

[2] In cases involving sensitive facts, we refer to the parties by their initials rather than their full names. *See, e.g.*, *In re I.M.K.*, 240 W. Va. 679, 682 n.1, 815 S.E.2d 490, 493 n.1 (2018); *In re S.H.*, 237 W. Va. 626, 628 n.1, 789 S.E.2d 163, 165 n.1 (2016). *See also* W. Va. R. App. P. 40(e) (restricting use of personal identifiers in cases involving children).

[3] The minor child, J.P., is currently four years old.

1

in the child's best interest. Having considered the briefs submitted on appeal, the appendix record, the parties' oral arguments, and the applicable legal authority, we reverse the final order of the Circuit Court of Berkeley County, and remand this matter for further proceedings consistent with this opinion.

## I.

## FACTUAL AND PROCEDURAL HISTORY

In June of 2017, Respondent West Virginia Department of Health and Human Resources ("DHHR") filed a child abuse and neglect petition against the biological parents of J.P. claiming that their alleged drug abuse impacted their ability to care for J.P.[4] The child was removed from the home of his biological parents on or about June 26, 2017. The mother completed an improvement period, and the child was returned to her custody in September of 2017. In April of 2018, the father's parental rights were involuntarily terminated. Two months later, in June of 2018, the DHHR filed a second abuse and neglect petition against mother after she was arrested for selling drugs to an undercover officer. The DHHR immediately placed J.P. with the Foster Parents.

One day after being placed with the Foster Family, on June 29, 2018, the Petitioners moved to intervene to have the child placed with their families in Philadelphia,

---

[4] J.P.'s paternal half-brother was also a party in this proceeding, but he was ultimately reunified with his biological mother and now lives with her in Philadelphia, Pennsylvania.

Pennsylvania. Paternal Grandfather lives with his adult daughter in Philadelphia, Pennsylvania, and Maternal Grandmother lives in her own residence, also in Philadelphia. At a multidisciplinary team ("MDT") meeting on July 26, 2018, Maternal Grandmother requested that the child live with her or her adult daughter. She also indicated that she was willing to move to West Virginia in order to have immediate placement of the child, and to avoid waiting for a home study to be completed pursuant to the Interstate Compact on the Placement of Children ("ICPC"). However, after the MDT meeting, it was determined that Maternal Grandmother was not a suitable placement for the child. Therefore, at the September 21, 2018 MDT meeting, Paternal Grandfather requested placement of J.P. with him, and began completing paperwork for the ICPC process in Pennsylvania.

Two months later, on November 20, 2018, mother's parental rights were involuntarily terminated, and the circuit court granted the Petitioners' motion to intervene. At the hearing, Paternal Grandfather clarified that he was requesting placement of J.P., and that he lived in the same home as his adult daughter, J.P.'s paternal aunt. Afterwards, the circuit court entered an order pursuant to the ICPC directing the DHHR to complete an ICPC home study of Paternal Grandfather's home. From here, setbacks in submitting information to the proper authorities caused delays in completing the home study; it is undisputed that these delays were not attributable to the Petitioners or the appropriateness of the Paternal Grandfather's home.

In January of 2019, the circuit court held a status hearing and learned from the guardian ad litem that the ICPC request had to be resubmitted by the DHHR. Thereafter, the DHHR did not resubmit the requested documents until April. Once the home study process was properly initiated, there were additional unspecified delays attributable to Pennsylvania's child welfare agency, which was assigned to conduct the home study. On May 14, 2019, the Foster Parents moved to intervene and requested permanent placement of the child. The circuit court granted them intervenor status on May 16, 2019.

In July of 2019, the circuit court held a series of hearings to determine J.P.'s placement. The Foster Parents presented the testimony of Dr. James Piper "Toby" Behrmann, a licensed clinical psychologist, who testified as an expert regarding child development and psychology.[5] In this case, Dr. Behrmann spent a significant amount of time examining signs of "Reactive Attachment Disorder." According to Dr. Behrmann, his main concern was that J.P. was at risk for "not attaching well . . . [t]he research shows that at [age] two if you are struggling with attachment, your risk for not attaching goes high."

---

[5] The Foster Parents retained the services of Dr. Behrmann. Meanwhile, Paternal Grandfather was unable to afford to retain his own rebuttal expert. He asked the court for state funding, but the court denied this request and stated that the Petitioners were not entitled to state funding for placement decisions. As such, the only expert to testify on the issue of placement in this matter was an expert retained by the Foster Parents.

During his testimony, Dr. Behrmann presented the findings of the bonding assessment he performed on the child and the adult parties, *i.e.*, the Foster Parents and the Petitioners. He first testified that the child acted appropriately with the Foster Parents and the other children in their home. Specifically, Dr. Behrmann commented on the foster father and how well he was "attuned" to the child's frustrations and moods. However, while the child appeared to be on the verge of forming an attachment with the Foster Parents—in particular, the foster father—the attachment had not yet formed, but was "decent and growing." Finally, Dr. Behrmann opined that the child was delayed in his ability to form deep close interpersonal bonds and was at an increased risk of developing Reactive Attachment Disorder if removed from the Foster Parents' home.

Next, Dr. Behrmann offered testimony on the interactions between the Petitioners and the child. He noted that Paternal Grandfather "did a good job. He was able to pick up on [J.P.]." Dr. Behrmann acknowledged that the child had spent more of his life with the Foster Parents than with Paternal Grandfather, and therefore, he observed that "attachment was less [with Paternal Grandfather] than with [Foster Parents]." However, he did note that Paternal Grandfather "was a comfort" and the child "was able to feel met by what [Paternal Grandfather] did for him." Regarding the child's ability to bond with Paternal Grandfather through placement, Dr. Behrmann stated: "The sad thing for me was I think Pennsylvania wouldn't accelerate whatever you need to do to look at the transfer so that cost another year. That was a critical time period in terms of attachment disorder risks."

However, despite his concerns regarding the risk of J.P.'s inability to form deep attachments, Dr. Behrmann testified that *both* the Foster Parents and the Paternal Grandfather were appropriate placements for the child and reported no concerns with the child's interactions with *either party*. When asked if he had any opinion about whether it would be detrimental to remove the child from the Foster Parents, Dr. Behrmann unequivocally stated: "I want to be clear I am not making a custody recommendation. I don't have the data. I haven't examined the homes. I haven't seen them enough. I don't know enough of the case."[6]

The circuit court also heard testimony from a DHHR worker, a social worker from the Children's Home Society, the Paternal Grandfather, and the Foster Parents. When questioned about the status of the home study, the DHHR worker testified that the ICPC request for the home study—first requested in November of 2018—was resubmitted in April of 2019, after a series of delays. She also testified that the DHHR had no

---

[6] Dr. Behrmann commented repeatedly on the fact that "[t]here are a lot of good people involved here. All the above parenting figures, at this point in time, deeply care about [J.P.]." After spending time with all of the parties involved, Dr. Behrmann commented once again on the difficulty of this case and his inability to make a final placement determination. In his report filed with the circuit court, Dr. Behrmann described some "regressive behavior" that J.P. experienced at his foster home after spending a weekend with the Petitioners:

> Was it because of extended time away from the [Foster Parents] and thus inherently too stressful on [J.P], being away from his now emotionally attached anchor point in life – [foster father]? Or was [J.P.] fitting to/bonding to paternal grandfather and maternal grandmother and found leaving them difficult, taking a while to re-attach to [foster father]? I can't know.

recommendation regarding the permanent placement of the child because Paternal Grandfather's home study had not been completed. However, she indicated that the DHHR would be more likely to recommend placement with the Foster Parents because the child had been in their care for over thirteen months. The circuit court stated that it would withhold its ruling until the completion of a home study of Paternal Grandfather's home.

The circuit court held a final placement hearing on September 9, 2019. At the hearing, a letter dated September 6, 2019, was presented indicating that a third-party company had completed a home study of Paternal Grandfather's home in Philadelphia. However, the DHHR argued that the letter was not an official document of the State of Pennsylvania and stated that it had not received any official documentation regarding the home study required by the ICPC.

After hearing final arguments from counsel, the circuit court went on to hand down its ruling by making additional findings of fact. In rendering its ruling, the court stressed that it had relied heavily on the testimony of Dr. Behrmann to determine which placement was in J.P.'s best interest. The court further noted that it also considered the mental and physical health of the parties and voiced its concerns about Paternal Grandfather's long term ability to parent a young child.[7] Ultimately, the circuit court found

---

[7] The circuit court noted in its order that it had

concerns about the [P]aternal [G]randfather's ability, due to his age, to parent a very young child long-term, specifically as the

that it was in the child's best interest to remain with the Foster Parents, and further found that the best interests of the child outweighed the statutory preference for grandparent adoption set forth in West Virginia Code § § 49-4-114(a)(3). The circuit court entered an order reflecting its decision on October 28, 2019. It is from this order that Petitioners appeal.

## II.

## STANDARD OF REVIEW

The instant proceeding is before this Court on appeal from the circuit court's final order in an abuse and neglect proceeding. In this context, we previously have held that,

> [a]lthough conclusions of law reached by a circuit court are subject to de novo review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm

> child approaches adolescence and later teenage years. The [c]ourt is concerned that the challenges of parenting an older adolescent could be too much for the [P]aternal [G]randfather at that time in his life.

Paternal Grandfather was fifty-two years old at the time of the September 2019 final placement hearing. Without any additional findings regarding Paternal Grandfather's health, we are not persuaded by the argument that Paternal Grandfather's age of fifty-two years would hinder his ability to parent J.P.

8

conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

Syl. pt. 1, *In re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996). Moreover, because we will be examining the statutory grandparent preference,[8] we also must be mindful of

the propriety of the meaning ascribed to the pertinent statutes by the circuit court. With respect to such matters, we previously have held that "[w]here the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995).

*In re K.L. and R.L.*, 241 W. Va. 546, 552, 826 S.E.2d 671, 677 (2019). With these standards in mind, we now address the issue presented: whether the circuit court correctly applied the grandparent preference found in West Virginia Code § 49-4-114(a)(3) under the facts of this case.

## III.

## DISCUSSION

In the case *sub judice*, this Court is faced with a situation where multiple families are fighting for the opportunity to provide J.P. with a safe, secure, and loving home. Both the Foster Parents and the Petitioners have expressed interest in adopting the

---

[8] *See* Section III, *infra*, for the text of West Virginia Code § 49-4-114(a)(3).

9

child, yet only one family can prevail under the law. In short, we are once again faced with a situation in which we are litigating a child's placement "only because too many people love this little boy." *In re Clifford K.*, 217 W. Va. 625, 646, 619 S.E.2d 138, 159 (2005). Here, the circuit court examined two suitable placements for J.P.—one placement with his Paternal Grandfather in Philadelphia, Pennsylvania, in close proximity to his Maternal Grandmother and biological half-brother, and the other placement with the Foster Parents, with whom he has lived for the duration of these proceedings—and, ultimately placed J.P. with the Foster Parents. In making its placement decision, the circuit court gave great weight to the fact that the child had spent a large portion of his life in foster care and was, therefore, on the cusp of building an attachment with the Foster Parents. However, on appeal to this Court, the Petitioners contend that the circuit court erred in failing to apply a statutory policy preference for grandparent adoption, and emphasized that the child's extended foster care stay was due to bureaucratic failures in both the West Virginia and Pennsylvania child welfare systems, and thus, the circuit court failed to give them an adequate opportunity to receive placement of their grandchild under the grandparent preference established by the West Virginia legislature.

In support of their position, the Petitioners argue that the circuit court erred in refusing to place J.P. with Paternal Grandfather after he had a favorable home study and a satisfactory evaluation from Dr. Behrmann. They further contend that procedural delays and breakdowns in the ICPC process magnified the extent to which the child was injured

10

because the ICPC process, as employed in this matter, failed to adequately and timely allow for consistent and familiar kinship interactions with the child when he needed it most.

Conversely, the Foster Parents and the DHHR argue that placement with the Foster Parents did not occur only because the DHHR and the ICPC failed to procure a timely home study of the Paternal Grandfather's home. Rather, they contend that in deciding to place the child with the Foster Parents, the circuit court found that while "both parties would be able to provide a loving, secure home for the child, the [c]ourt believe[d] that allowing the child to remain in the home of the foster family, with an adoption by same, [was] in the child's best interest." Additionally, in furtherance of its goal to meet the best interests of the child, the court found that the Foster Parents have shown "that they will seek out the appropriate services that the child needs, and engage in said services, in order to attempt to help the child heal from the damage he has suffered and will continue to do so in the future."

To resolve the matter presently before us, we need look no further than the law of this State. The West Virginia Legislature recognized the importance of grandparent-grandchild relationships when it adopted the grandparent preference to govern the adoption of children whose parents' parental rights have been terminated in the context of abuse and neglect proceedings. Under West Virginia Code § 49-4-114(a)(3), the DHHR is expressly required to determine whether grandparent placement would be appropriate before considering placing a child with other potential adoptive parents:

11

For purposes of any placement of a child for adoption by the department, the department shall first consider the suitability and willingness of any known grandparent or grandparents to adopt the child. Once grandparents who are interested in adopting the child have been identified, the department shall conduct a home study evaluation, including home visits and individual interviews by a licensed social worker. If the department determines, based on the home study evaluation, that the grandparents would be suitable adoptive parents, it shall assure that the grandparents are offered the placement of the child prior to the consideration of any other prospective adoptive parents.

The grandparent preference also has been set forth in the DHHR's internal regulations, which state, in part: "The statute contemplates that placement with grandparents is presumptively in the best interests of the child, and the preference for grandparent placement may be overcome only where the record reviewed in its entirety establishes that such placement is not in the best interests of the child." *See* West Virginia Department of Health and Human Resources, *Adoption Policy* § 7.3 (revised March 17, 2020).

Further, we have specifically recognized that "[t]he grandparent preference articulated in West Virginia Code § 49-3-1(a) must be recognized as essential guidance in the determination of child placement." *Napoleon S. v. Walker*, 217 W. Va. 254, 261, 617 S.E.2d 801, 808. Nonetheless, while we emphasize the importance of the grandparent preference, we also note that this Court has found that the preference is not absolute. In the case of *In re Elizabeth F.,* 225 W. Va. 780, 696 S.E.2d 296 (2010) (per curiam), this

12

Court reversed the circuit court's placement of a child with her grandparents, and reiterated

that the best interests of the child must always be considered in the first instance.

Specifically, the Court stated:

> Our prior holdings in *Napoleon* are critically important insofar
> as we explicitly recognized that a crucial component of the
> grandparent preference is that the adoptive placement of the
> subject child with his/her grandparents must serve the child's
> best interests. Absent such a finding, adoptive placement with
> the child's grandparents is not proper.

*In re Elizabeth F.* at 786, 696 S.E.2d at 302. Thus, while this preference must be balanced

with the best interests of the child, it is the child's best interest that serves as the ultimate

determinable factor. *See, e.g.*, Syl. pt. 5, in part, *Carter v. Carter*, 196 W. Va. 239, 470

S.E.2d 193 (1996) ("In . . . custody matters, we have traditionally held paramount the best

interests of the child.").

In this regard, we have examined the interplay of the grandparent preference

statute and the child's best interest, and explained that

> West Virginia Code § 49-3-1(a)[3] provides for
> grandparent preference in determining adoptive placement for
> a child where parental rights have been terminated and also
> incorporates a best interests analysis within that determination
> by including the requirement that the DHHR find that the
> grandparents would be suitable adoptive parents prior to
> granting custody to the grandparents. *The statute contemplates*
> *that placement with grandparents is presumptively in the best*
> *interests of the child, and the preference for grandparent*
> *placement may be overcome only where the record reviewed*
> *in its entirety establishes that such placement is not in the best*
> *interests of the child.*

Syl. pt. 4, *Napoleon S.*, 217 W. Va. 254, 617 S.E.2d 801 (emphasis added). Moreover,

13

> [b]y specifying in West Virginia Code § 49-3-1(a)(3) that the home study must show that the grandparents "would be suitable adoptive parents," the Legislature has implicitly included the requirement for an analysis by the Department of Health and Human Resources and circuit courts of the best interests of the child, given all circumstances of the case.

Syl. pt. 5, *Napoleon S.*, 217 W. Va. 254, 614 S.E.2d 801.

As noted above, the sole issue before this Court is whether, with respect to the permanent placement of J.P., the circuit court erred in placing him with the Foster Parents for adoption rather than with Paternal Grandfather in view of the statutory preference for grandparent placement. Based upon our review of the foregoing authorities relied upon, we find that the circuit court erred in placing J.P. with the Foster Parents.

Unlike this Court's previous cases[9] dealing with the grandparent preference, the current case largely turns on the delays and shortcomings of the West Virginia DHHR

---

[9] This Court has a long history of analyzing the statutory grandparent preference located at West Virginia Code § 49-4-114(a)(3). However, in the majority of these cases, the best interests of the child trumped the grandparent preference because the grandparent was found to be unfit. *See, e.g.*, *In re K.E.*, 240 W. Va. 220, 809 S.E.2d 531 (2018) (awarding placement of the child to the foster family because grandparents took minimal steps to obtain custody at the beginning of the proceedings and concerns arose over the fact that the grandparents' children, *i.e.*, the parents whose rights had been terminated, lived down the street in a house owned by the grandparents); *In re L.M.*, 235 W. Va. 436, 774 S.E.2d 517 (2015) (ruling that custody of the child should be given to foster family after learning that maternal grandparents had exposed grandchildren to items from biological mother's meth-contaminated home); *In re Aaron H.*, 229 W. Va. 677, 735 S.E.2d 274 (2012) (ruling that adoptive placement of child with foster parents was proper because grandfather could not comply with submitting paperwork; he did not request additional time to complete the required paperwork, and he was found to be "transient");

and its counterpart agencies in Pennsylvania. As this Court has emphasized, abuse and neglect proceedings constitute a large part of our docket, and "[m]any of these cases are replete with failures of the DHHR to live up to their responsibilities, not only to protect children who are abused and/or neglected, but to address these children's individualized special needs which are often related to or the result of the abuse and/or neglect." *State ex rel. W. Va. Dep't of Health & Human Res. v. Dyer*, 242 W. Va. 505, ___, 836 S.E.2d 472, 482 (2019). Consequentially, as a result of these unfortunate delays, we find that the circuit court in the present case failed to apply the grandparent preference in an appropriate manner. While we recognize that this case presented a difficult decision for the circuit court—where two families were vying to provide the child with a safe, secure, and loving home—it must be noted that being presented with a difficult decision does not excuse a circuit court from examining all of the evidence required to be considered by the governing statutory law and the applicable decisions of this Court.

---

*In re Hunter H.*, 227 W. Va. 699, 715 S.E.2d 397 (2011) (placing child with foster family because grandmother had occasional drug use in the home, and she resorted to yelling and smacking as a form of discipline); *In re Elizabeth F.*, 225 W. Va. 780, 696 S.E.2d 296 (2010) (per curiam) (finding that best interests of the child were met by placement with the foster family due to grandparent's willingness to allow child multiple interactions with grandparent's adult children who abused drugs and whose rights to the child had been terminated).

Unlike the grandparents in the above-referenced cases, in the case *sub judice*, Paternal Grandfather was found to be a fit, suitable placement for the child.

Here, the circuit court focused almost exclusively on Dr. Behrmann's expert testimony regarding the child being on "the cusp" of forming a strong attachment bond with the Foster Parents, the length of time the child had spent with the Foster Parents over the course of his short life, and the importance of the child remaining "in a consistent placement." We acknowledge that each of these concerns is valid and important to the circuit court's decision. Nevertheless, in making these findings, the court ignored that the length of said placement was almost entirely the fault of the delays caused and perpetuated by the West Virginia and Pennsylvania state agencies involved, and utterly failed to give any credence to the statutory law applicable to the unique facts of this case.

Petitioners have been involved in the underlying abuse and neglect proceedings, and have expressed their interest in adopting J.P. since the very beginning of this case—specifically, Petitioners came to West Virginia, retained an attorney, and requested placement of the child just *one day* after he was removed from his mother's home and placed with the Foster Parents in June of 2018. In November of 2018, once it was decided that Paternal Grandfather would be the grandparent seeking J.P.'s placement, the circuit court entered an order pursuant to the ICPC, directing the DHHR to facilitate the completion of an ICPC home study of Paternal Grandfather's home. However, once the paperwork was submitted, a series of bureaucratic delays ensued.

In January of 2019, the DHHR was informed that it had requested the wrong home study under the ICPC, and that it needed to resubmit the paperwork. At the

16

placement hearing in July of 2019, the DHHR employee testified that the documentation was not resubmitted to the State of Pennsylvania until late March or early April—some three to four months after the DHHR had learned of its mistake. When asked why the resubmission was delayed for so long, the DHHR employee testified: "Because I was not aware how to do an ICPC." At the final placement hearing in September of 2019, the circuit court acknowledged that a letter from Pennsylvania New Foundations, Inc., was filed with the court. The letter—addressed to Paternal Grandfather—informed him that he was approved as an ICPC Resource Parent. Counsel for the DHHR stated that it had been unable to get a "clear answer" from anyone in Pennsylvania as to whether Paternal Grandfather had been officially approved by that State. The circuit court suggested that the DHHR should be able to verify the letter through an ICPC worker in Charleston; however, the DHHR never produced anyone to testify in this regard. Despite the existence of the letter, however, the circuit court noted in its final order that the letter "was not an official document indicating the status of whether or not the [Paternal Grandfather's] home study had actually been passed by the State of Pennsylvania or West Virginia." Although these delays are not attributable to any one agency, and no one person can be fairly accused of causing them, such lengthy delays and missteps are unacceptable particularly when a young child is awaiting permanency. *See* Syl. pt. 1, in part, *In Interest of Carlita B.*, 185 W. Va. 613, 408 S.E.2d 365 (1991) ("Child abuse and neglect cases must be recognized as being among the highest priority for the courts' attention. Unjustified procedural delays wreak havoc on a child's development, stability and security.").

We find that the evidence provided to us in the record illustrates that Paternal Grandfather is fit to care for his grandson, J.P., and that placing the child with Paternal Grandfather is in J.P.'s best interest. As this Court held in *Napoleon S.:* "The statute contemplates that placement with grandparents is *presumptively in the best interests of the child*, and the preference for grandparent placement *may be overcome only* where the record reviewed in its entirety establishes that such placement is *not* in the best interests of the child." Syl. pt. 4, in part, *Napoleon S. v. Walker*, 217 W. Va. 254, 617 S.E.2d 801 (2005) (emphasis added); *see also* West Virginia Code § 49-4-114(a)(3). While this Court appreciates the thorough testimony and observations of Dr. Behrmann and the circuit court's attempt to act in the best interests of the child in this case, we find that the evidence put forth shows that Paternal Grandfather should have been granted placement of the child in accordance with the statutory grandparent preference.[10] Here,

---

[10] This Court has emphasized the importance of grandparent-grandchild relationships in prior cases. As we stated in *Petition of Nearhoof*, 178 W. Va. 359, 359 S.E.2d 587 (1987):

> It is biological fact that grandparents are bound to their grandchildren by the unbreakable links of heredity. It is common human experience that the concern and interest grandparents take in the welfare of their grandchildren far exceeds anything explicable in purely biological terms. A very special relationship often arises and continues between grandparents and grandchildren. The tensions and conflicts which commonly mar relations between parents and children are often absent between those very same parents and their grandchildren. Visits with a grandparent are often a precious part of a child's experience and there are benefits which devolve upon the grandchild from the relationship with his grandparents which he cannot derive from any other relationship. Neither the Legislature nor this Court is blind to

18

there was no evidence presented to the circuit court that showed unfitness on behalf of the Paternal Grandfather. Rather, in rendering its ruling, the circuit court explicitly stated that Paternal Grandfather *was able* to provide a safe, secure, and loving environment for the child: "I do not think either party would not be able to provide a stable and loving environment. I believe that both of the homes could provide that."

Furthermore, it was the Guardian ad Litem's opinion that grandparent placement was in J.P.'s best interest. At the final placement hearing, the Guardian told the court:

> All I can do as the Guardian Ad Litem is see how [J.P.] interacts with his foster parents, see how [J.P.] interacts with his grandparents, and review the court reports, review the records from the social workers and professionals who have been trained at being able to identify any concerns, review the recommendations of Dr. Behrmann, and then make a recommendation to the Court[.] . . . I believe in doing so that is why my position has been and continues to be under the current situation to allow for [J.P.] to be placed permanently with his paternal grandfather.

The Guardian further emphasized her position in the brief she submitted to this Court. She strongly noted that it was her recommendation "that placement with the foster family would in her opinion provide short term relief to immediate risks of developing attachment

---

human truths which grandparents and grandchildren have always known.

*Id.* at 364, 359 S.E.2d at 592 (quoting *Mimkon v. Ford*, 66 N.J. 426, 437, 332 A.2d 199, 204-05 (1975)).

disorders[,] but run contrary to the [child's] long-term cultural, biological, familial, and ethnic interests." Further, the GAL feared

> that as the [child] reaches an age of greater understanding and begins to learn of these proceedings and the measures taken by his biological family to keep him within the family unit[, it] will cause the [child] longterm sorrow and resentment in adolescence and adulthood which may likely destroy any bond the [child] would have formed with his foster parents and deprive him of the long-term attachments he would need in adulthood. [11]

Accordingly, we find that the best interests of J.P. would best be promoted by placing him with Paternal Grandfather. Although this is a difficult decision based on the adequacy of both homes, we cannot ignore this State's statutory preference carved out for grandparents who are found to be a fit and appropriate placement for their grandchild. Therefore, we reverse the circuit court's final order placing the child with the Foster Parents and remand this case for entry of an order permanently placing the child with Paternal Grandfather.[12] Upon remand, the circuit court is further instructed to ensure that the

---

[11] We would be remiss if we did not acknowledge the Guardian ad Litem's diligent representation of J.P. in this case. In spite of countless delays by the DHHR in requesting Paternal Grandfather's home study and the additional delays propounded by the agencies in Pennsylvania, the Guardian, when faced with this lack of information, took it upon herself to travel to Philadelphia to visit Paternal Grandfather's home to determine its suitability for J.P.'s placement. We greatly appreciate the Guardian's advocacy for her minor client's best interests, and her willingness to conduct such an investigation in this case when information was lacking.

[12] In light of our conclusion that the circuit court erred when it disregarded the statutory grandparent preference, we need not address Petitioners' alternative contention that the circuit court also erred by failing to apply the statutory sibling preference to the facts of this case. *See* West Virginia Code § 49-4-111(d)-(f) (LexisNexis 2015).

appropriate measures are implemented in facilitating this custodial transfer to minimize any harm to the child. *See* Syl. pt. 3, *James M. v. Maynard*, 185 W. Va. 648, 408 S.E.2d 400 (1991) ("It is a traumatic experience for children to undergo sudden and dramatic changes in their permanent custodians. Lower courts in cases such as these should provide, whenever possible, for a gradual transition period, especially where young children are involved. Further, such gradual transition periods should be developed in a manner intended to foster the emotional adjustment of the children to this change and to maintain as much stability as possible in their lives.").

## IV.

## CONCLUSION

For the reasons set forth above, the October 28, 2019 order of the Circuit Court of Berkeley County is hereby reversed, and this case is remanded for further proceedings consistent with this Opinion.

Reversed and Remanded.

21